**James HAZELWOOD, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 10A01–9205–CR–124.

Court of Appeals of Indiana,
First District.

Feb. 24, 1993.

192

Vicki L. Carmichael, Chief Public Defender, Jeffersonville, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Cynthia L. Ploughe, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee-plaintiff.

BAKER, Judge.

Defendant-appellant James Hazelwood appeals his convictions for fraud, a Class D felony,[1] and conspiracy to commit fraud, also a Class D felony.[2] Hazelwood raises several issues for our review, which we have rephrased as:

I. Whether the trial court erroneously denied his three motions for continuance.

II. Whether a witness invaded the province of the jury by proclaiming Hazelwood's guilt.

III. Whether the trial court erroneously admitted certain testimony protected by the marital privilege.

IV. Whether the trial court erroneously admitted extrinsic evidence.

We affirm.

## FACTS

The evidence most favorable to the verdict reveals that sometime before December 1, 1989, Hazelwood told Dorothy Kinser, his girlfriend, that he had come up with a moneymaking scheme: fake a car accident and collect the insurance proceeds. Kinser initially refused to participate but later changed her mind.

On December 1, 1989, Hazelwood met Kinser on a deserted road behind the Greentree Mall in Clarksville, Indiana. As Kinser was preparing to intentionally back her car into Hazelwood's car, a police officer drove by and asked if everything was all right. After receiving assurances all was fine, the officer left. Kinser then went ahead and backed into Hazelwood's passenger-side door and fender. Hazelwood, however, believed that not enough

---

1. IND.CODE 35-43-5-4.

2. IND.CODE 35-43-5-4; IND.CODE 35-41-5-2. With no small amount of distress we observe that although the record of proceedings contains no less than thirty-one pages of subpoenas, none of which even remotely relate to the issues presented, the record does not contain a copy of the amended information charging Hazelwood with conspiracy to commit fraud. (Fortunately, a portion of the amended information was included in one of the jury instructions.) We remind all of Ind. Appellate Rule 7.2(B), which states, "[n]either party shall request parts of the record or a transcript of the proceedings which are not needed for the issues to be asserted upon the appeal ...," and we suggest—in no uncertain terms—that the parties' attorneys exercise more care in the preparation of the record.

damage was done, so he climbed in Kinser's car and made sure the job was done right the second time.

Hazelwood did not want to file the "accident" report in Clarksville because the same police officer might return, so the two drove their cars to a Jeffersonville parking lot and called the police from there. Hazelwood told Kinser he was going to pretend he had been slightly injured. A police officer arrived and completed the accident report. Hazelwood and Kinser then met at a restaurant and prepared the insurance papers.

Kinser later began to regret the incident and told Hazelwood she did not want the fraud to continue. Hazelwood told her that it was too late, because the insurance claim had been filed already. Distressed, Kinser contacted a local attorney, and together the two went to the police. Kinser then contacted her insurance company, J.C. Penney, and reported the claim was fraudulent. Hazelwood was charged with fraud and conspiracy to commit fraud.

During the trial the State was permitted to introduce evidence that after the incident described above occurred, Hazelwood tried to defraud another insurance company by faking a burglary of his home.[3] The introduction of this evidence forms the basis of Hazelwood's latter two allegations of error.

A jury convicted Hazelwood of both fraud and conspiracy to commit fraud. He appeals.

## DISCUSSION AND DECISION

### I. Continuance

Hazelwood first contends the trial court wrongly refused to grant three of his motions for continuance. The first of these motions was filed on November 27, 1991, on the grounds that counsel had only recently been appointed to represent Hazelwood and needed time to locate several out-of-state witnesses. The second motion was made December 4, 1991, the day before trial, and again sought more time to locate witnesses. The trial court denied both motions, observing that because the State's presentation at trial was expected to be lengthy, Hazelwood would have several additional days to prepare his defense adequately. The third motion was made at the close of the State's case-in-chief and sought time to obtain a copy of Kinser's insurance policy and car registration, apparently in hopes of suggesting that if the insurance policy was not in force because Kinser's car was not properly registered, Kinser may have had reason to lie about the accident. This motion, too, was denied.

"Continuances to allow more time for preparation are not favored and are granted only by showing good cause and in the furtherance of justice." *Olson v. State* (1990), Ind., 563 N.E.2d 565, 569. The denial of a motion for continuance lies within the sound discretion of the trial court and will be reviewed only for an abuse of that discretion. *Conner v. State* (1991), Ind., 580 N.E.2d 214, *cert. denied*, — U.S. —, 112 S.Ct. 1501, 117 L.Ed.2d 640. An abuse of discretion occurs when the ruling is against the logic and effect of the facts and circumstances before the trial court. *Porter v. Porter* (1988), Ind.App., 526 N.E.2d 219, 222, *trans. denied.*

The trial court's denials did not run counter to the facts and circumstances facing it. An inspection of the record of proceedings reveals both parties had already benefitted from continuances granted previously. *See Record* at 35, 49, 60, 65, 68, and 71. In sum, it appears the trial court's patience for delay was near its end when Hazelwood made his requests for yet more time. Given the rule disfavoring continuances and the trial court's correct belief that the State's presentation would be lengthy, thus allowing Hazelwood more time to prepare, we conclude the trial court did not abuse the discretion afforded it by

---

**3.** We understand that as of the time the briefs for this case were being prepared, Hazelwood faced criminal charges stemming from his alleged attempt to stage the burglary. We wish to make it clear at the outset that in no way are we attempting to pass judgment on this second incident.

denying the two motions made immediately before trial.

■ Neither did the trial court abuse its discretion by denying Hazelwood's third motion, made after the close of the State's case-in-chief. The trial court's reasoning was clear. After observing the trial had been interrupted twice already, the trial court remarked: "I'm concerned about [the jury's] ability to continue to keep all of this in focus if we drag it out for another day to explore this issue [of the insurance policy and car registration]. I'm going to deny the motion to continue then." *Record* at 978. Hazelwood had ample time to obtain copies of the insurance policy and car registration. Again, we cannot say the motion's denial was against the logic and effect of the facts and circumstances before the trial court. There was no error.

## II. Witness's Comment on Guilt

After examining the car, Deborah Burgin, a J.C. Penney insurance adjuster, observed the rust on the fender was very dark. Because it had been her experience that rust becomes darker as it ages, Burgin concluded the damage to the fender was not recent. Hazelwood, however, claimed the damage to the fender was the result of the accident. Based on her observations, Burgin scribbled on the written claim form that she did not agree the damage she observed occurred on December 1, 1989, the day Hazelwood claimed it occurred. The trial court admitted Burgin's report and her accompanying testimony into evidence over Hazelwood's objection that the report amounted to an impermissible comment on his guilt or innocence. Hazelwood continues this argument here.

■ Ultimate questions like a defendant's guilt or innocence are reserved exclusively for the finder of fact. To resolve ultimate issues, the jury must assess credibility and weigh evidence on its own. *Jones v. State* (1991), Ind.App., 581 N.E.2d 1256, 1258. The preclusion of opinion testimony facilitates this process. *Id.* In sum, "it is highly improper in any type of crimi-

nal case to place an expert on the witness stand and then ask that expert the very question which is the question for the determination by the jury, that is, the guilt or innocence of the defendant." *Ross v. State* (1987), Ind., 516 N.E.2d 61, 63.

■ The comments forbidden by *Ross, Jones,* and cases like them were not made in Hazelwood's case. Burgin was not asked "the very question which is the question for the determination by the jury, that is, the guilt or innocence of the defendant." Rather, Burgin was asked whether, based on her knowledge and observations, she agreed the accident occurred on December 1, 1989. She said she did not agree the accident occurred on December 1, 1989. We reject Hazelwood's contention that Burgin's answer is the equivalent of an outright statement that Hazelwood was guilty of trying to defraud the insurance company. Although Burgin's response might be evidence of guilt, it is far from the statement that Hazelwood was, in fact, guilty of fraud. The trial court did not erroneously admit Burgin's testimony.

## III. Marital Privilege

Hazelwood next argues the trial court wrongly allowed Hazelwood's ex-wife, Amy,[4] to testify concerning a staged burglary. He claims he was protected by the marital privilege.

Over objection, Amy testified that 1) Hazelwood told her they could make easy money by falsely reporting a burglary and collecting the insurance proceeds; 2) Hazelwood rummaged through their house immediately upon returning from their honeymoon and made it look as if someone had burgled it; and 3) she called the police and reported the "crime" because Hazelwood asked her to do so. Hazelwood insists none of this information should have been disclosed to the jury.

■ IND.CODE 34-1-14-5 provides, in part, that husbands and wives shall not be competent witnesses as to communications made to each other. This has been interpreted as protecting only those communica-

---

4. Amy and James Hazelwood were married— and divorced—after the automobile incident.

tions "as pass from one to the other by virtue of the confidence resulting from their intimate relations with one another." *Kindred v. State* (1988), Ind., 524 N.E.2d 279, 295 (citing *Beyerline v. State* (1897), 147 Ind. 125, 130, 45 N.E. 772, 774).

Further, "communications" are not limited to written or spoken words; acts may also be included. *Kindred, supra,* at 296. When determining whether a particular act is protected by the marital privilege, "it is important to ascertain whether the communicating spouse intended to convey a message to the other." *Id.*

The marital privilege is not absolute, however; it is subject both to waiver and to certain exceptions. For example, when a communication between husband and wife is made in the presence of a third person, it has been held that no privilege exists due to the lack of confidentiality. *Holt v. State* (1985), Ind., 481 N.E.2d 1324, 1326, *cert. denied,* 481 U.S. 1031, 107 S.Ct. 1960, 95 L.Ed.2d 532. The same is true for a communication "intended to be transmitted to a third person[.]" *Perkins v. State* (1985), Ind., 483 N.E.2d 1379, 1383. Additionally, "the law is clear that for the marital privilege to prevail, the parties must have a legally recognized marriage." *Holt, supra,* at 1326. The rule does not extend to engaged couples. *Id.*

The trial court did not erroneously admit Amy Hazelwood's testimony that they could make easy money by falsely reporting a burglary. This information was communicated "about a month or so before we were married." *Record* at 789. Because the communication was not made during the marriage, it was not subject to protection by the marital privilege. *Id.*

We consider the testimony that Hazelwood rummaged through the house to make it look as if a burglary occurred and that Amy reported the "crime" because Hazelwood asked her to do so to be more problematic. Hazelwood's act of staging a burglary was ripe with communicative intent, with "messages" undoubtedly intended for the police, the insurance company, and Amy, if not others. Her testimony

that she called the police and reported the burglary because Hazelwood wanted her to do so raises similar concerns. Calling the police to report a burglary seems to be a message intended for the police, but doing so because Hazelwood asked her reveals the underlying reason she acted, which, in turn, suggests a confidential communication intended to be transmitted solely between husband and wife.

We need not sort out the problems arising from the multifaceted nature of these particular communicative acts, however, because even if we assume the second and third portions of Amy's testimony were wrongly introduced, the error was simply cumulative of evidence that was properly admitted. Amy's statement that Hazelwood told her they could make easy money if they staged a burglary and reported it encompassed and dwarfed the latter two statements. Indeed, the latter two statements functioned solely to add two details: that Hazelwood rummaged through the house to make it look like a burglary had occurred and that Amy called the police to report the burglary when requested. In the vernacular, the cat was already out of the bag.

It must also be remembered that Hazelwood was not on trial for staging a burglary. He was on trial for staging an automobile accident and trying to bilk the insurance company. As we explain more fully in the following section, Amy's testimony was admissible for a limited purpose only, namely, to show that Hazelwood may have possessed a culpable intent on the day of the automobile accident. The jury was specifically instructed to refrain from relying on Amy's testimony concerning the burglary as direct evidence of Hazelwood's guilt concerning the automobile incident. The point is that even if the second and third communications were wrongly admitted, their disclosure did not have a significant impact on the jury, given the limited purpose for which the testimony was admissible. When combined with the fact that Amy was properly allowed to testify that Hazelwood told her they could make some easy money if they reported a false burgla-

ry, we must conclude that any error in admitting the second and third portions of Amy's testimony was harmless.

### IV. Extrinsic Offense

Finally, Hazelwood argues that even if the evidence concerning the allegedly faked burglary was not protected by the marital privilege, it should have been excluded under the rule excluding extrinsic offenses.

■ Whether evidence of a particular "bad" act extrinsic to the one charged is admissible has long been the subject of debate in Indiana and elsewhere. Indiana cases, the Federal Rules of Evidence, and the Model Rules of Evidence all agree the general rule is that "evidence of criminal activity other than that charged is inadmissible on the question of guilt...." *Mason v. State* (1984), Ind., 467 N.E.2d 737, 739. By now it has been long-established, however, that evidence of extrinsic offenses may be admissible for a different purpose, such as to prove intent, motive, purpose, identity, or common scheme or plan. *Id.* The exceptions apply to evidence of acts committed both before and after the crime charged. *See Id.* (common scheme or plan). In *Lannan v. State* (1992), Ind., 600 N.E.2d 1334, our supreme court formally adopted Federal Rule of Evidence 404(b), which, in pertinent part, reads as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....[5]

Despite extrinsic evidence's tendency to show bad character or criminal propensity, it is admissible so long as it makes the existence of an element of the crime charged more probable than it would be without the evidence. *Id.* at 1339.

At trial, the State argued Amy Hazelwood's testimony of the staged burglary was admissible to prove both intent and a common scheme or plan. The trial court admitted the evidence under the latter theory. This was incorrect.

Indiana recognizes two branches of the common scheme or plan exception. The first allows admission of extrinsic activity as evidence of a pre-conceived plan that includes the charged crime. *Gibbs v. State* (1989), Ind., 538 N.E.2d 937, 939. To be admissible, the crimes must be "so related in character, time, and place of commission as to establish some plan which embraced both the prior and subsequent criminal activity and the charged crime." *Id.* The second branch permits the admission of extrinsic evidence to establish intent, motive, purpose, or identity by showing the defendant committed other offenses with a similar *modus operandi. Id.*

■ Even though only a lesser degree of similarity between the charged crime and the extrinsic offense is required when proving state of mind, as opposed to proving identity, *id.*, that "lesser degree" is not sufficiently present in this case to make evidence of the burglary admissible under the common scheme or plan exception. The State argues that in both cases Hazelwood staged an incident, caused a false police report to be filed, and then filed a fraudulent insurance claim. Be that as it may, we are unconvinced that this evidence, standing alone, is enough to qualify for admissibility under either branch of the common scheme or plan exception. The evidence that Hazelwood had a pre-conceived plan encompassing both the auto accident and the burglary is practically non-existent, and the mere fact that he has tried to defraud insurance companies on more than one occasion does not amount to a *modus operandi.* After all, "[t]he mere repetition of similar crimes is not enough to

---

**5.** The supreme court's adoption of Fed.R.Evid. 404(b) was "effective from this day forward." *Id.* "This day" was October 16, 1992, the day *Lannan* was decided. Because Hazelwood's appeal was pending when Fed.R.Evid. 404(b) was adopted, Fed.R.Evid. 404(b) is applicable to our analysis. *Pirnat v. State* (1992), Ind., 600 N.E.2d 1342, *reh'g denied,* (1993), 607 N.E.2d 973; *Vanover v. State* (1992), Ind.App., 605 N.E.2d 218.

qualify for an exception to the general rule [of inadmissibility]." *Id.*

■ We find the incorrect admission of Amy's testimony under the common scheme or plan exception harmless, however, because the evidence was admissible for another reason: to prove intent. *See Hebel v. Conrail, Inc.* (1985), Ind., 475 N.E.2d 652, 660–61 (harmless error to admit evidence for wrong reason so long as the evidence was properly admissible under another theory). Amy Hazelwood's testimony makes the existence of her ex-husband's fraudulent intent more probable than it would be without her testimony, and was therefore admissible for the limited purpose of proving a culpable state of mind. *Lannan, supra.* Federal courts addressing Fed.R.Evid. 404(b) have consistently reached the same conclusion under analogous circumstances. *See, e.g., U.S. v. Radseck* (7th Cir.1983), 718 F.2d 233, *cert. denied,* 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (evidence that insurance company claims manager had thrice attempted to make kickback arrangements similar to one which was the subject of prosecution and had earlier spoken of cheating the insurance company by inflating bills admissible under Fed.R.Evid. 404(b) to prove intent); *U.S. v. Weidman* (7th Cir.1978), 572 F.2d 1199, *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (evidence concerning earlier schemes bearing close resemblance to pending mail fraud allegation admissible to prove intent); *Peters v. U.S.* (5th Cir.1967), 376 F.2d 839 (evidence that defendant had earlier knowingly purchased counterfeit currency admissible to prove defendant's state of mind in passing counterfeit securities).

Neither are we persuaded that the trial court's erroneous application of the common scheme or plan exception biased the jury in any way. The trial court instructed the jury that Amy Hazelwood's testimony "is not to be considered by you in determining whether the State proved beyond a reasonable doubt that the Defendant damaged his own property in Clark County, Indiana, on December 1, 1989 or whether he agreed with another person to do so."

*Record* at 239. It also instructed the jury to "keep in mind that [Amy Hazelwood's] testimony pertains to events alleged to have occurred in another jurisdiction at another time. The Defendant is not on trial here concerning those allegations." *Record* at 239. Although meant to apply to the common scheme or plan exception, this language functions equally well under the intent rubric. The important thing is that the jurors were warned not to consider Amy Hazelwood's testimony as direct evidence of Hazelwood's bad character, criminal propensity, and guilt. For these reasons, we hold the introduction of the extrinsic evidence was proper.

The judgment is affirmed.

NAJAM and MILLER, JJ., concur.